## SACRAMENTO SUBURBAN FRUIT LANDS CO. v. McKEW et ux.

Circuit Court of Appeals, Ninth Circuit. December 17, 1929.

No. 5656.

Butler, Van Dyke & Desmond, of Sacramento, Cal., and Arthur C. Huston, of Woodland, Cal., for appellant.

Ralph H. Lewis and George E. McCutchen, both of Sacramento, Cal., for appellees.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

DIETRICH, Circuit Judge. This is one of·a group of cases submitted together here in which the plaintiffs recovered judgments for alleged fraudulent representations made by appellant to induce them severally to purchase divers tracts of land in the Rio Linda district or project near Sacramento, Cal. In its background and some of its aspects the case is very similar to that of Sacramento Suburban Fruit Lands Co. v. Melin (No. 5671, decision. filed Dec. 17, 1929) 36 F.(2d) 907. Below there was a judgment on the verdict against the defendant company, from which it prosecutes this appeal. It assigns twelve errors, some of which are ruled by the Melin Case, and some, for want of appropriate exceptions, we cannot consider. We deem it necessary ·to discuss but two, both of which involve the charge to the jury.

Plaintiffs are husband and wife, and, at the time they entered into the contract to purchase 'one of the small tracts from defendant, they resided at Winnipeg, Canada. In their complaint they alleged that defendant, knowing of their ignorance of lands in California, and their value, and that they (plaintiffs) would be compelled to rely upon representations made to them, "falsely and fraudulently and with intent to cheat and defraud plaintiffs stated and represented to plaintiffs that all of the Sacramento County lands being sold by defendants were of the fair and reasonable market value of $350.00 per acre and upwards and that all of said lands and particularly the lands subsequently purchased by plaintiffs were rich and fertile, were capable of producing all sorts of farm crops and products; that all of the land thereof was entirely free from all conditions and things injurious or · harmful to the ·growth of fruit-trees; that said land was perfectly adapted to the raising of fruits of all kinds and was capable of producing large crops of fruit of the finest quality."

From their testimony it appears that, in some way coming into contact with them, Walter R. Eggertson, one of the defendant's selling agents, who was promoting the project in Winnipeg, had conversations with them, and furnished to them printed literature put out by the defendant, with the result that they signed a contract for the purchase of one of the tracts and paid a part of the agreed price. Later they came to Sacramento, went over the project, and ultimately selected a tract other than the one originally described, paid the balance of the agreed purchase price, and took a deed.

It will be observed that, generally speaking, the allegation of fraud covers two subjects, one of the "fair and reasonable market value" of the land and the other of its availability or suitability for agricultural purposes and particularly for the raising of deciduous fruits. With only the former are we presently concerned. To some extent in the Melin Case we discussed the question of whether a representation touching the value of land may constitute the basis of an action for fraud. The two cases are measurably different in point of fact. The plaintiffs here had had 'no experience in farming or fruit raising, knew nothing about California lands generally, or these lands particularly, before they visited California, and hence while in Canada they were without available means of information. It may well be, therefore, if the averments of their complaint which fully disclose these and other conditions are true, their charge of misrepresentation touching value states a case of actionable fraud.

When we resort to the testimony, however, we find the evidence upon the subject fails to measure up to the charge. Mr. McKew did not testify that any representation touching value was made in Canada. After he and his wife came to Sacramento and expressed dissatisfaction with the tract described in their contract, they were given the privilege of another choice, and they selected lot 44. In respect to this Mr. McKew testified: "Subsequently we took Lot No. 44, the north eight acres. He (not Eggertson but another agent who went about with them) said it was valued at $400 an acre. That is what we paid for it." That is his only testimony on the subject. Referring to conversations with the agent, Eggertson, in Winnipeg, Mrs. McKew's only testimony on the point was: "As to the value of the land, he said it was $350 an acre up, and was advancing in price all the time, and we would have to hurry or else all the choice locations would be taken." While the consideration is not of vital importance, we are inclined to think that the testimony of both witnesses means nothing more than that the agents

thus gave them the prices or values at which the company was offering the land for sale.

Eggertson's deposition was introduced in evidence by defendant. Presumably it was taken before the trial and before either the defendant or he could know just what the plaintiffs' testimony would be; and it is to be assumed that in interrogating him counsel for the company used as a basis for his questions the averments of the complaint. He testified: "I did not tell Mr. McKew at any time that all of the Sacramento County lands being sold by the Sacramento Suburban Fruit Lands Company were of the fair and reasonable market value of three hundred and fifty dollars per acre. Concerning the price of the land I referred him to our price list. I did discuss with him the question of whether or not other lands in the vicinity of Rio Linda could be purchased at a greater or less price than three hundred fifty dollars per acre. The question of market value was not discussed between me and Mr. McKew at all."

We find no other evidence upon the subject, but in its instructions to the jury the court said:

"Now, as to the representation as to value: Both plaintiffs testified that the agent, Eggertson, represented to them that the land was worth $400 an acre, that its value was worth $400 an acre. Eggertson, in his deposition, denies it. There is a clear conflict in the evidence. It will be for you to determine who you will believe, the plaintiffs, who say that Eggertson did advise them the land was of the value of $400 an acre, or Eggertson, who says that he did not say that. You may ask yourselves which is more reasonable. It was selling the land to them for $400 an acre. Is it unreasonable that an agent should then say, 'Not only am I selling it to you for $400 an acre, but its value is that much.' You are supposed, Gentlemen, in a bargain, to give value for value, and if he was getting $400 an acre from plaintiffs, is it unlikely that he told them, as they said he did, that its value was $400 an acre?

"Now, Gentlemen of the Jury, as matter of law, if the land was represented to these plaintiffs as of the value of $400 an acre, in the circumstances, that was not an expression of opinion, but is a statement of fact, and if it is false then the two would be sufficient to entitle the plaintiffs, if the other conditions are satisfied, to recover in this action."

The better view, we think, is that there is no necessary conflict in the testimony and that the plaintiffs testified only that the agents advised them of the price for which the company would sell. But, if possibly it is susceptible to a different construction, the question was one for the jury and not for the court.

■ Aside from that consideration, we think the last part of the instruction was erroneous. The qualifying phrase "in the circumstances" means nothing, for the jurors were not advised what circumstances were thus assumed; nor were they advised in what form or language it was assumed the representation was made, or what was assumed to be plaintiffs' understanding of the representations, or what the "other conditions" were. As has already been shown, until after the parties came to California and went over the project, there was no representation at all touching the value of the tract finally purchased, nor was the price or value of $400 mentioned. Indeed, when construed in the light of the record, the instructions fall little short of advising the jury that, if defendant sold the land for more than it was actually worth, it should be required to refund the excess.

The other assignment to which we have referred is in effect that the court's discussion of the testimony, which was of extreme length, was not impartial, but was argumentative to an unwarranted degree. No precise general rule can be laid down, but the principle is well stated in Wallace v. United States, 291 F. 972, 973, where the Circuit Court of Appeals for the Sixth Circuit said:

"We understand the net effect of the decisions to be that while, under proper conditions, the judge may express his opinions and the reasons for them, and discuss the testimony, his charge must remain, upon the whole, impartial, dispassionate and judicial, and must not be argumentative to a degree which makes it characteristically an act of advocacy."

■ On a careful examination, we are of the opinion that the instructions here went beyond the limitation thus expressed. We do not attempt to analyze them comprehensively, but one feature may be pointed out for concrete illustration. The defendant produced as a witness one Jarvis, who, seemingly, was a man of technical training and considerable practical experience in respect of fruit lands and horticulture in California. He was apparently a man of good standing, and his general reputation for veracity was not called into question. Commenting upon his testimony, the court said:

"Another witness testified that, in his opinion, the land would grow deciduous fruits

in commercial quantities. That was the witness Jarvis. You heard his testimony, comparing his land with other like land in other places, where he says he knows fruit has been produced commercially, and he says that this land will produce fruit commercially successfully. He was asked if he did not state to Mrs. Klaffenbach that on her land, with two and a half or three feet of soil, it would be useless to examine it, because anyone would know that fruit would not grow on that hardpan land profitably. He said he did not say that. Mrs. Klaffenbach took the stand and testified that he did say so. If you believe he did say it heretofore, what is his opinion worth now? If he did say it heretofore, and denies it now, how faithful is he to his oath? These are questions for you. The same rule applies to any witness who, you may believe, testified falsely in any particular."

In the light of the record we do not think this was a fair comment. Of course, if the jurors believed the witness had made the statement to which Mrs. Klaffenbach testified, they could, and probably would, have considered the fact as weakening, if not entirely destroying, the effect of his testimony, but the underlying question was whether he had made it. The court did not direct attention to the fact that the only impeaching testimony was that of Mrs. Klaffenbach, and, according to her own admission, she was at the time a plaintiff in an action similar to this, to recover damages against the defendant, and hence was deeply interested. Nor did the court comment upon the further significant fact that she, an interested party, was the only one called to testify to Jarvis' alleged statement, though, according to her testimony, there were present at the time, she said it was made a Mr. Brennan, president of the Fruit Growers' Exchange, a Mr. Morrison, who was one of the county commissioners, a Mr. Wallnitz, and her husband. Moreover, when it is analyzed and compared, it becomes extremely doubtful whether there was any real conflict between the testimony of Jarvis and that of Mrs. Klaffenbach. It is to be remembered that the whole case proceeded on the theory that hardpan land of a certain character would produce fruit profitably. The plaintiffs' contention was not that deciduous fruit cannot be commercially grown on hardpan land, but only that the hardpan in this particular property was so near the surface and of such character that fruit could not be successfully grown. That it could be so grown on certain kinds of hardpan land was again and again stated by plaintiffs' principal expert, and to that extent Jarvis' testimony was in harmony with his. In answer to questions laying the foundation for impeachment, Jarvis testified:

"I don't think I bored on the Klaffenbach place. I bored on the McKew and I bored on the Wallnitz and quite a number around the Klaffenbach place. * * * I remember I was on the Klaffenbach place. I don't think we compared that place with any other. I did not say to Mrs. Klaffenbach at that time and place that there was no use investigating the Klaffenbach place because no hardpan land would raise fruit profitably."

It is manifestly improbable that he made the statement thus impliedly attributed to him, for it would not only have been out of harmony with the testimony he had given, but in conflict with the real facts as conceded by plaintiffs and their principal expert. And, when we examine Mrs. Klaffenbach's testimony, we find that she did not claim that he made such statement, but only that he said that fruit would not grow commercially on her land or possibly land of like character. Her testimony was:

"I asked Mr. Jarvis the reason he did not get out of the car after being there half an hour and examine our ten acres and go through our orchard and he said 'No, I won't bother to take the time. You have not any fruit land there. You can't grow fruit commercially on that hardpan land."

The judgment will be reversed, with directions to grant a new trial.